KAVANAUGH, Circuit Judge,
dissenting from the denial of rehearing en banc:
The FCC’s 2015 net neutrality rule is one of the most consequential regulations ever issued by any executive or independent agency in the history of the United States. The rule transforms the Internet by imposing common-carrier obligations on Internet service providers and thereby prohibiting Internet service providers from exercising editorial control over the content they transmit to consumers. The rule will affect every Internet service provider, every Internet content provider, and every Internet consumer. The economic and political significance of the rule is vast.
The net neutrality rule is unlawful and must be vacated, however, for two alternative and independent reasons.
First, Congress did not clearly authorize the FCC to issue the net neutrality rule. Congress has debated net neutrality for many years, but Congress has never enacted net neutrality legislation or clearly authorized the FCC to impose common-carrier obligations on Internet service providers. The lack of clear congressional authorization matters. In a series of important cases over the last 25 years, the Supreme Court has required clear congressional authorization for major agency rules of this kind. The Court, speaking through Justice Scalia, recently summarized the major rules doctrine in this way: “We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast ‘economic and political significance.’ ” Utility Air Regulatory Group v. EPA, — U.S. —, 134 S.Ct. 2427, 2444, 189 L.Ed.2d 372 (2014) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 160, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)). The major rules doctrine helps preserve the separation of powers and operates as a vital check on expansive and aggressive assertions of executive authority.
Here, because Congress never passed net neutrality legislation, the FCC relied on the 1934 Communications Act, as amended in 1996, as its source of authority for the net neutrality rule. But that Act does not supply clear congressional authorization for the FCC to impose common-carrier regulation on Internet service providers. Therefore, under the Supreme Court’s precedents applying the major *418 rules doctrine, the net neutrality rule is unlawful.
Second and in the alternative, the net neutrality rule violates the First Amendment to the U.S. Constitution. Under the Supreme Court’s landmark decisions in Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), and Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), the First Amendment bars the Government from restricting the editorial discretion of Internet service providers, absent a showing that an Internet service provider possesses market power in a relevant geographic market. Here, however, the FCC has not even tried to make a market power showing. Therefore, under the Supreme Court’s precedents applying the First Amendment, the net neutrality rule violates the First Amendment.
In short, although the briefs and commentary about the net neutrality issue are voluminous, the legal analysis is straightforward: If the Supreme Court’s major rules doctrine means what it says, then the net neutrality rule is unlawful because Congress has not clearly authorized the FCC to issue this major rule. And if the Supreme Courtfs Turner Broadcasting decisions mean what they say, then the net neutrality rule is unlawful because the rule impermissibly infringes on the Internet service providers’ editorial discretion. To state the obvious, the Supreme Court could always refíne or reconsider the major rules doctrine or its decisions in the Turner Broadcasting cases. But as a lower court, we do not possess that power. Our job is to apply Supreme Court precedent as it stands.
For those two alternative and independent reasons, the FCC’s net neutrality regulation is unlawful and must be vacated. I respectfully disagree with the panel majority’s contrary decision and, given the exceptional importance of the issue, respectfully dissent from the denial of rehearing en banc.[1]
I
The FCC’s net neutrality rule is a major rule, but Congress has not clearly authorized the FCC to issue the rule. For that reason alone, the rule is unlawful.
A
The Framers of the Constitution viewed the separation of powers as the great safeguard of liberty in the new National Government. To protect liberty, the Constitution divides power among the three branches of the National Government. The Constitution vests Congress with the legislative power. U.S. Const. art. I, § 1. The Constitution vests the President with the executive power, including the responsibility to “take Care that the Laws be faithfully executed.” Id. art. II, § 1, cl. 1; id. § 3. The Constitution vests the Judiciary with the judicial power, including the power in appropriate cases to determine whether the Executive has acted consistently with the Constitution and statutes. See id. art. III, §§ 1, 2; Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).
*419 Under the Constitution’s separation of powers, Congress makes the laws, and the Executive implements- and enforces the laws. The Executive Branch does not possess a general, free-standing authority to issue binding legal rules. The Executive may issue rules only pursuant to and consistent with a grant of authority from Congress (or a grant of authority directly from the Constitution). See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).
When the Judiciary exercises its Article III authority to determine whether an agency’s rule is consistent with a governing statute, two competing canons of statutory interpretation come into play.
First, for ordinary agency rules, the Supreme Court applies what is known as Chevron deference to authoritative agency interpretations of statutes. If the statute is clear, the agency must follow the statute. But if the statute is ambiguous, the agency has discretion to adopt its own preferred interpretation, so long as that interpretation is at least reasonable. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The theory of Chevron is that a statutory ambiguity or gap reflects Congress’s implicit delegation of authority for the agency to make policy and issue rules within the reasonable range of the statutory ambiguity or gap.
Second, in a narrow class of cases involving major agency rules of great economic and political significance, the Supreme Court has articulated a countervailing canon that constrains the Executive and helps to maintain the Constitution’s separation of powers. For an agency to issue a major rule, Congress must clearly authorize the agency to do so. If a statute only ambiguously supplies authority for the major rule, the rule is unlawful. This major rules doctrine (usually called the major questions doctrine) is grounded in two overlapping and reinforcing presumptions: (i) a separation of powers-based presumption against the delegation of major lawmaking authority from Congress to the Executive Branch, see Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 645-46, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (opinion of Stevens, J.), and (ii) a presumption that Congress intends to make major policy decisions itself, not leave those decisions to agencies.
In short, while the Chevron doctrine allows an agency to rely on statutory ambiguity to issue ordinary rules, the major rules doctrine prevents an agency from relying on statutory ambiguity to issue major rules.
Justice Breyer appears to have been the first to describe a dichotomy between ordinary and major rules and to articulate the major rules doctrine as a distinct principle of statutory interpretation. In an article written more than 30 years ago, he explained the principle this way: When determining “the extent to which Congress intended that courts should defer to the agency’s view of the proper interpretation,” courts should take into account the legislative reality that Congress may grant the Executive Branch the authority to resolve various “interstitial matters,” but Congress itself is “more likely to have focused upon, and answered, major questions.” Stephen Breyer, Judicial Review of Questions of Law and Policy, 38 Admin. L. Rev. 363, 370 (1986). Citing Justice Breyer’s 1986 article, the Supreme Court later explained that, in “extraordinary cases,” Congress could not have “intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.” FDA v. Brown & Wil *420 liamson Tobacco Corp., 529 U.S. 120, 159, 160, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).
In keeping with the principle articulated by Justice Breyer, the Supreme Court has repeatedly rejected agency attempts to take major regulatory action without clear congressional authorization. Consider the following examples:
• MCI Telecommunications Corp. v. American Telephone & Telegraph Co., 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994). The Communications Act of 1934 gave the FCC authority to “modify” rate-filing requirements. The FCC issued a rule that completely exempted certain telephone companies from rate-filing requirements. The Court struck down the rule, holding that the FCC’s authority to modify statutory requirements did not permit the agency to eliminate those requirements. It would have been a major step for the FCC to eliminate those requirements. Yet there was no clear statutory authority for the FCC to do so. The Court explained that it was “highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion.” Id. at 231, 114 S.Ct. 2223.
• FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). The Food, Drug, and Cosmetic Act gave the FDA broad and general authority to regulate “drugs” and “devices.” The FDA attempted to use this general authority to regulate the tobacco industry, including cigarettes. Regulating cigarettes would have been a major economic and political action. Yet there was no clear statutory authorization for the FDA to regulate the tobacco industry generally, or cigarettes specifically. The Court thus invalidated the rule, stating that it was “confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.” Id. at 160, 120 S.Ct. 1291.
• Gonzales v. Oregon, 546 U.S. 243, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). The Controlled Substances Act gave the Attorney General authority to de-reg-ister physicians, thus preventing them from writing prescriptions for certain drugs, if the Attorney General concluded that de-registration was in the “public interest.” The Attorney General issued an interpretive rule declaring that physicians could not prescribe controlled substances for assisted suicides. It would have been a major step for the Attorney General to proscribe physician-assisted suicide in this way. Yet there was no clear statutory authority for the Attorney General to do so. The Court therefore rejected the rule, stating that it “would be anomalous for Congress to have so painstakingly described the Attorney General’s limited authority to deregister a single physician or schedule a single drug, but to have given him, just by implication, authority to declare an entire class of activity outside the course of professional practice.” Id. at 262, 126 S.Ct. 904 (internal quotation marks omitted). “The idea that Congress gave the Attorney General such broad and unusual authority through an implicit delegation in the CSA’s registration provision is not sustainable.” Id. at 267, 126 S.Ct. 904.
• Utility Air Regulatory Group v. EPA, — U.S. —, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014). Various parts of the Clean Air Act gave the Environmental Protection Agency authority to *421 regulate “any air pollutant.” It was not clear whether greenhouse gases were air pollutants for all Clean Air Act programs. The EPA nonetheless promulgated a rule subjecting millions of previously unregulated emitters of greenhouse gases to burdensome permitting regulations under the Clean Air Act’s Prevention of Significant Deterioration and Title V permitting programs. It would have been a major step for EPA to regulate the greenhouse gas emissions of so many large and. small facilities. But there was no clear statutory authorization for the ■EPA to do so. As a result, the Supreme Court vacated the relevant part of the rule, stating: “When an agency claims to discover in a long-extant statute an unheralded power to regulate ‘a significant portion of the American economy,’ we typically greet its announcement -with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast ‘economic and political significance.’ ” Id. at 2444 (quoting Brown & Williamson, 529 U.S. at 159, 160, 120 S.Ct. 1291) (citation omitted).[2]
The lesson from those cases is apparent. If an agency wants to exercise expansive regulatory authority over some major social or economic activity — regulating cigarettes, banning physician-assisted suicide, eliminating telecommunications rate-filing requirements, or regulating greenhouse gas emitters, for example — an ambiguous grant of statutory authority is not enough. Congress must dearly authorize an agency to take such a major regulatory action.[3]
Consistent with the Supreme Court case law, leading scholars on statutory interpretation have recognized the significance of the major rules doctrine. Professor Esk-ridge has explained the doctrine this way: The “Supreme Court has carved out a potentially important exception to delega *422 tion, the major questions canon. Even if Congress has delegated an agency general rulemaking or adjudicatory power, judges presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions.” William N. Eskridge Jr, Interpreting Law: A Primer on How to Read Statutes and the Constitution 288 (2016). The “key reason” for the doctrine, Professor Eskridge has explained, “is the strong presumption of continuity for major policies unless and until Congress has deliberated about and enacted a change in those major policies .... Because a major policy change should be made by the most democratically accountable process — Article I, Section 7 legislation — this kind of continuity is consistent with democratic values.” Id. at 289.
In their landmark study of Congress’s statutory drafting practices, Professors Gluck and Bressman likewise stated that “the major questions doctrine is a departure from Chevron’s simple presumption of delegation. In particular, that doctrine supports a presumption of nondelegation in the face of statutory ambiguity over major policy questions or questions of major political or economic significance.” Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside — An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 1003 (2013). Their empirical study concluded that the major rules doctrine reflects congressional intent and accords with the in-the-arena reality of how legislators and congressional staff approach the legislative function. As one congressional official put it to them: “Major policy questions, major economic questions, major political questions, preemption questions are all the same.. Drafters don’t intend to leave them unresolved.” Id. at 1004 (internal quotation marks and alterations omitted).[4]
In short, the major rules doctrine constitutes an important principle of statutory interpretation in agency eases. As a lower court, we must follow the major rules doctrine as it has been articulated by the Supreme Court.
B
In order for the FCC to issue a major rule, Congress must provide clear authorization. We therefore must address two questions in this case: (1) Is the net neutrality rule a major rule? (2) If so, has Congress clearly authorized the FCC to issue the net neutrality rule?
1
The FCC’s net neutrality rule is a major rule for purposes of the Supreme Court’s major rules doctrine. Indeed, I believe that proposition is indisputable.
The Supreme Court has described major rules as those of “vast ‘economic and political significance.’ ” UARG, 134 S.Ct. at 2444 (quoting Brown & Williamson, 529 U.S. at 160, 120 S.Ct. 1291). The Court has not articulated a bright-line test that distinguishes major rules from ordinary rules. As a general matter, however, the Court’s cases indicate that a number of factors are relevant, including: the amount of money *423 involved for regulated and affected parties, the overall impact on the economy, the number of people affected, and the degree of congressional and public attention to the issue. See UARG, 134 S.Ct. at 2443-44 (regulation would impose massive- compliance costs on millions of previously unregulated emitters); Gonzales v. Oregon, 546 U.S. at 267, 126 S.Ct. 904 (physician-assisted suicide is an important issue subject to “earnest and profound debate across the country”); Brown & Williamson, 529 U.S. at 126-27, 133, 143-61, 120 S.Ct. 1291 (FDA’s asserted authority would give it expansive power over tobacco industry, which was previously unregulated under the relevant statute); MCI, 512 U.S. at 230, 231, 114 S.Ct. 2223 (rate-filing requirements are “utterly central” and of “enormous importance” to the statutory scheme). The Court’s concern about an agency’s issuance of a seemingly major rule is heightened, moreover, when an agency relies on a long-extant statute to support the agency’s bold new assertion of regulatory authority. See UARG, 134 S.Ct. at 2444.
To be sure, determining whether a rule constitutes a major rule sometimes has a bit of a “know it when you see it” quality. So there inevitably will be close cases and debates at the margins about whether a rule qualifies as major. But under any conceivable test for what makes a rule major, the net neutrality rule qualifies as a major rule.
The net neutrality rule is a major rule because it imposes common-carrier regulation on Internet service providers. (A common carrier generally must carry all traffic on an equal basis without unreasonable discrimination as to price and carriage.) In so doing, the net neutrality rule fundamentally transforms the Internet by prohibiting Internet service providers from choosing the content they want to transmit to consumers and from fully responding to their customers’ preferences. The rule therefore wrests control of the Internet from the people and private Internet service providers and gives control to the Government. The rule will affect every Internet service provider, every Internet content provider, and every Internet consumer. The financial impact of the rule — in terms of the portion of the economy affected, as well as the impact on investment in infrastructure, content, and business — is staggering. Not surprisingly, consumer interest groups and industry groups alike have mobilized extraordinary resources to influence the outcome of the policy discussions.
Moreover, Congress and the public have paid close attention to the issue. Congress has been studying and debating net neutrality regulation for years. It has considered (but never passed) a variety of bills relating to net neutrality and the imposition of common-carrier regulations on Internet service providers. See, e.g., H.R. 5252, 109th Cong. (2006); H.R. 5273, 109th Cong. (2006); H.R. 5417, 109th Cong. (2006); S. 2360, 109th Cong. (2006); S. 2686, 109th Cong. (2006); S. 2917, 109th Cong. (2006); S. 215, 110th Cong. (2007); H.R. 5353, 110th Cong. (2008); H.R. 5994, 110th Cong. (2008); H.R. 3458, 111th Cong. (2009); S. 74, 112th Cong. (2011); S. 3703, 112th Cong. (2012); H.R. 2666, 114th Cong. (2016). The public has also focused intensely on the net neutrality debate. For example, when the issue was before the FCC, the agency received some 4 million comments on the proposed rule, apparently the largest number (by far) of comments that the FCC has ever received about a proposed rule. Indeed, even President Obama publicly weighed in on the net neutrality issue, an unusual presidential action when an independent agency is considering a proposed rule. See Statement on Internet Neutrality, 2014 Daily Comp. *424 Pres. Doc. 841 (Nov. 10, 2014). The President’s intervention only underscores the enormous significance of the net neutrality issue.
In addition, as in other cases where the Supreme Court has held that the major rules doctrine applied, the FCC is relying here on a long-extant statute — namely, the Communications Act of 1934, as amended in 1996. In UARG, the Supreme Court wrote the following: “When an agency claims to discover in a long-extant statute an unheralded power to regulate ‘a significant portion of the American economy,’ we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast ‘economic and political significance.’ ” 134 S.Ct. at 2444 (quoting Brown & Williamson, 529 U.S. at 159, 160, 120 S.Ct. 1291) (citation omitted). The Court in UARG might as well have been speaking about the net neutrality rule. That UARG language is directly on point here.
The net neutrality rule is a major rule under any plausible conception of' the major rules doctrine. As Judge Brown rightly states, “any other conclusion would fail the straight-face test.” Brown Dissent at 402.
2
Because the net neutrality rule is a major rule, the next question is whether Congress dearly authorized the FCC to issue the net neutrality rule and impose common-carrier regulations on Internet service providers. The answer is no.
Congress enacted the Communications Act in 1934 and amended it in 1996. The statute sets up different regulatory schemes for “telecommunications services” and “information services.” To simplify for present purposes, the statute authorizes heavy common-carrier regulation of telecommunications services but light regulation of information services. (Recall that a common carrier generally must carry all traffic on an equal basis without unreasonable discrimination as to price and carriage.) The statute was originally designed to regulate telephone service providers as common carriers.
By the time of the 1996 amendments to the Act, the Internet had come into being. The 1996 amendments reflected that development. Among other things, the amendments articulated a general philosophy of limited regulation of the Internet. “It is the policy of the United States,” Congress stated, “to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.” 47 U.S.C. § 230(b).
In keeping with the express statutory philosophy of light regulation of the Internet, the FCC until 2015 regulated Internet service provided over cable systems as an information service, the lighter regulatory model. The 1934 Act (as amended in 1996) permits such light regulation of the Internet. What that Act does not clearly do is treat Internet service as a telecommunications service and thereby authorize the FCC to regulate Internet service providers as common carriers. At most, the Act is ambiguous about whether Internet service is an information service or a telecommunications service.
Since 1996, Congress has not passed a statute clearly classifying Internet service as a telecommunications service or otherwise giving the FCC authority to impose common-carrier regulations on Internet service providers. That inaction has not been the result of inattention. On the contrary, as noted above, Congress has been studying and debating the net neutrality issue for years. And Congress has considered a variety of bills relating to *425 net neutrality and the imposition of common-carrier regulations on Internet service providers. But none of those bills has passed.
In 2015, notwithstanding the lack of clear congressional authorization, the FCC decided to unilaterally plow forward and issue its net neutrality rule. The rule classified Internet service as a telecommunications service and imposed onerous common-carrier regulations on Internet service providers. By doing so, the FCC’s 2015 net neutrality rule upended the agency’s traditional light-touch regulatory approach to the Internet.
The problem for the FCC is that Congress has not clearly authorized the FCC to classify Internet service as a telecommunications service and impose common-carrier obligations on Internet service providers. Indeed, not even the FCC claims that Internet service is clearly a telecommunications service under the statute. On the contrary, the FCC concedes that “the Communications Act did not clearly resolve the question of how broadband should be classified.” FCC Opposition Br. 9. Therefore, by the FCC’s own admission; Congress has not clearly authorized the FCC to subject Internet service providers to the range of burdensome common-carrier regulations associated with telecommunications services.
Under the major rules doctrine, that is the end of the game for the net neutrality rule: Congress must clearly authorize an agency to issue a major rule. And Congress has not done so here, as even the FCC admits.
To avoid that conclusion, the FCC relies almost exclusively on the Supreme Court’s 2005 decision in National Cable & Telecommunications Association v. Brand X Internet Services, 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). In Brand X, the FCC had classified Internet service over cable lines as an information service and, consistent with that classification, imposed only light regulation on Internet service providers. Various petitioners sued to try to force the FCC to classify Internet service as a telecommunications service and to impose common-carrier regulation on Internet service providers. The Supreme Court stated that the statute was ambiguous about whether Internet service was an information service or a telecommunications service. The Court applied Chevron deference and upheld the FCC’s decision to classify Internet service as an information service and to subject Internet service providers to only light regulation.
Here, the FCC argues that, under Brand X, the agency has authority to classify Internet service as a telecommunications service because the statute is ambiguous. The FCC is badly mistaken. Brand Xs finding of statutory ambiguity cannot be the source of the FCC’s authority to classify Internet service as a telecommunications service. Rather, under the major rules doctrine, Brand Xs finding of statutory ambiguity is a bar to the FCC’s authority to classify Internet service as a telecommunications service.
Importantly, the Brand X Court did not have to — and did not — consider whether classifying Internet service as a telecommunications service and imposing common-carrier regulation on the Internet would be consistent with the major rules doctrine. In other words, Brand X nowhere addressed the question presented in this case: namely, whether Congress has clearly authorized common-carrier regulation of Internet service providers.[5] Therefore, we *426 must consider that question in the first instance. And that is where Brand X’s finding of statutory ambiguity actually torpedoes the FCC’s current argument. Brand Xs finding of ambiguity by definition means that Congress has not clearly authorized the FCC to issue the net neutrality rule. And that means that the net neutrality rule is unlawful under the major rules doctrine.[6]
[[Image here]]
The FCC adopted the net neutrality rule because the agency believed the rule to be wise policy and because Congress would not pass it. The net neutrality rule might be wise policy. But even assuming that the net neutrality rule is wise policy, congressional inaction does not license the Executive Branch to take matters into its own hands. Far from it. See Hamdan v. Rumsfeld, 548 U.S. 557, 636, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (Breyer, J., concurring) (gravely serious policy problem is nonetheless not a “blank check” for the Executive Branch to address the problem); Youngstown Sheet & Tube Co., 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (Jackson, J., concurring). Under our system of separation of powers, an agency may act only pursuant to statutory authority and may not exceed that authority. For major rules, moreover, the agency must have clear congressional authorization. The net neutrality rule is a major rule. But Congress has not clearly authorized the FCC to issue that rule. Under the Supreme Court’s major rules doctrine, the net neutrality rule is therefore unlawful and must be vacated.[7]
II
The net neutrality rule is unlawful for an alternative and independent reason. The rule violates the First Amendment, as that Amendment has been interpreted by the Supreme Court. Absent a demonstration that an Internet service provider possesses market power in a relevant geographic market — a demonstration that the FCC concedes it did not make here — imposing common-carrier regulations on Internet service providers violates the First Amendment.
A
The threshold question is whether the First Amendment applies to Internet service providers when they exercise editorial *427 discretion and choose what content to carry and not to carry. The answer is yes.
Article I of the Constitution affords Congress substantial power to regulate interstate commerce. But the Eirst Amendment demands that the Government employ a more “laissez-faire regime” for the press and other editors and speakers in the communications marketplace. Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 161, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (Douglas, J., concurring in judgment).
Ratified in 1791, the First Amendment provides that “Congress shall make no law ... abridging the freedom of speech, or of the press.” U.S. Const, amend. I. The First Amendment protects an independent media and an independent communications marketplace against takeover efforts by the Legislative and Executive Branches. The First Amendment operates as a vital guarantee of democratic self-government.
At the time of the Founding, the First Amendment protected (among other things) the editorial discretion of the many publishers, newspapers, and pamphleteers who produced and supplied written communications to the citizens of the United States. For example, the Federal Government could not tell newspapers that they had to publish letters or commentary from all citizens, or from citizens who had different viewpoints. The Federal Government could not compel book publishers to accept and promote all books on equal terms or to publish books from authors with different perspectives. As Benjamin Franklin once remarked, his newspaper “was not a stagecoach, with seats for everyone.” Columbia Broadcasting System, 412 U.S. at 152, 93 S.Ct. 2080 (Douglas, J., concurring in judgment) (quoting Frank Luther Mott, American Journalism: A History, 1690-1960, at 55 (3d ed. 1962)).
The Supreme Court’s landmark decisions in Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), and Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (Turner Broadcasting II), established that those foundational First Amendment principles apply to editors and speakers in the modern communications marketplace in much the same way that the principles apply to the newspapers, magazines, pamphleteers, publishers, bookstores, and newsstands traditionally protected by the First Amendment.
The Turner Broadcasting cases addressed “must-carry” regulation of cable operators. The relevant statute required cable operators to carry certain local and public television stations. Proponents of must-carry regulation argued that the First Amendment posed little barrier to must-carry regulation because cable operators merely operated the pipes that transmitted third-party content and did not exercise the kind of editorial discretion that was traditionally protected by the First Amendment.
The Supreme Court, speaking though Justice Kennedy in both Turner Broadcasting cases, rejected that threshold argument out of hand. The Court held that “cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment.” Turner Broadcasting, 512 U.S. at 636, 114 S.Ct. 2445. As the Court recognized, cable operators deliver television content to subscribers. Although the cable operators may not always generate that content themselves, they decide what content to transmit. That decision, the Supreme Court stated, constitutes an act of editorial discretion receiving First Amendment protection. In the Court’s words: “Through ‘original programming or *428 by exercising editorial discretion over which stations or programs to include in its repertoire,’ cable programmers and operators ‘seek to communicate messages on a wide variety of topics and in a wide variety of formats.’ ” Id. (alteration omitted) (quoting Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 494, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986)); see also Arkansas Educational Television Commission v. Forbes, 523 U.S. 666, 674, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (“Although programming decisions often involve the compilation of the speech of third parties, the decisions nonetheless constitute communicative acts.”).
The Court’s ultimate conclusion on that threshold First Amendment point was not obvious beforehand. One could have imagined the Court saying that cable operators merely operate the transmission pipes and are not traditional editors. One could have imagined the Court comparing cable operators to electricity providers, trucking companies, and railroads — all entities subject to traditional economic regulation. But that was not the analytical path charted by the Turner Broadcasting Court. Instead, the Court analogized the cable operators to the publishers, pamphleteers, and bookstore owners traditionally protected by the First Amendment. As Turner Broadcasting concluded, the First Amendment’s basic principles “do not vary when a new and different medium for communication appears” — although there of course can be some differences in how the ultimate First Amendment analysis plays out depending on the nature of (and competition in) a particular communications market. Brown v. Entertainment Merchants Association, 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) (internal quotation mark omitted).
Here, of course, we deal with Internet service providers, not cable television operators. But Internet service providers and cable operators perform the same kinds of functions in their respective networks. Just like cable operators, Internet service providers deliver content to consumers. Internet service providers may not necessarily generate much content of their own, but they may decide what content they will transmit, just as cable operators decide what content they will transmit. Deciding whether and how to transmit ESPN and deciding whether and how to transmit ESPN.com are not meaningfully different for First Amendment purposes.
Indeed, some of the same entities that provide cable television service — colloquially known as cable companies — provide Internet access over the very same wires. If those entities receive First Amendment protection when they transmit television stations and networks, they likewise receive First Amendment protection when they transmit Internet content. It would be entirely illogical to conclude otherwise. In short, Internet service providers enjoy First Amendment protection of their rights to speak and exercise editorial discretion, just as cable operators do.
The FCC advances two primary arguments in its effort to distinguish Turner Broadcasting and demonstrate that there is no real First Amendment issue here.
First, the FCC argues (and the panel agreed) that Turner Broadcasting does not apply in this case because many Internet service providers do not actually exercise editorial discretion to favor some content over others. Many Internet service providers simply allow access to all Internet content providers on an equal basis. For that reason, the FCC contends that it may prevent Internet service providers from exercising their editorial discretion or speech rights to favor some content or disfavor other content.
*429 I find that argument mystifying. The FCC’s “use it or lose it” theory of First Amendment rights finds no support in the Constitution or precedent. The FCC’s theory is circular, in essence saying: “They have no First Amendment rights because they have not been regularly exercising any First Amendment rights and therefore they have no First Amendment rights.” It may be true that some, many, or even most Internet service providers have chosen not to exercise much editorial discretion, and instead have decided to allow most or all Internet content to be transmitted on an equal basis. But that “carry all comers” decision itself is an exercise of editorial discretion. Moreover, the fact that the Internet service providers have not been aggressively exercising their editorial discretion does not mean that they have no right to exercise their editorial discretion. That would be akin to arguing that people lose the right to vote if they sit out a few elections. Or citizens lose the right to protest if they have not protested before. Or a bookstore loses the right to display its favored books if it has not done so recently. That is not how constitutional rights work. The FCC’s “use it or lose it” theory is wholly foreign to the First Amendment.
Relatedly, the FCC claims that, under the net neutrality rule, an Internet service provider supposedly may opt out of the rule by choosing to carry only some Internet content. But even under the FCC’s description of the rule, an Internet service provider that chooses to carry most or all content still is not allowed to favor some content over other content when it comes to price, speed, and availability. That half-baked regulatory approach is just as foreign to the First Amendment. If a bookstore (or Amazon) decides to carry all books, may the Government then force the bookstore (or Amazon) to feature and promote all books in the same manner? If a newsstand carries all newspapers, may the Government force the newsstand to display all newspapers in the same way? May the Government force the newsstand to price them all equally? Of course not. There is no such theory of the First Amendment. Here, either Internet service providers have a right to exercise editorial discretion, or they do not. If they have a right to exercise editorial discretion, the choice of whether and how to exercise that editorial discretion is up to them, not up to the Government.
Think about what the FCC is saying: Under the rule, you supposedly can exercise your editorial discretion to refuse to carry some Internet content. But if you choose to carry most or all Internet content, you cannot exercise your editorial discretion to favor some content over other content. What First Amendment case or principle supports that theory? Crickets.[8]
*430 Second, the FCC suggests that Turner Broadcasting may not apply in the same way in the Internet context because the Internet service providers do not face the same kind of scarcity-of-space problem that a cable operator, for example, might face. In other words, the FCC argues that cable operators have fixed “space” and can carry only a limited number of channels; therefore, forced-carriage requirements would necessarily restrict First Amendment rights by depriving cable operators of their ability to carry some desired content. By contrast, for the Internet, forced-carriage requirements do > not necessarily deprive Internet service providers of their ability to carry any of their desired content. There is space for everyone.
That argument, too, makes little sense as a matter of basic First Amendment law. First Amendment protection does not go away simply because you have a large communications platform. A large bookstore has the same right to exercise editorial discretion as a small bookstore. Suppose Amazon has capacity to sell every book currently in publication and therefore does not face the scarcity of space that a bookstore does. Could the Government therefore force Amazon to sell, feature, and promote every book on an equal basis, and prohibit Amazon from promoting or recommending particular books or authors? Of course not. And there is no reason for a different result here. Put simply, the Internet’s technological architecture may mean that Internet service providers can provide unlimited content; it does not mean that they must.
Keep in mind, moreover, why that is so. The First Amendment affords editors and speakers the right not to speak and not to carry or favor unwanted speech of others, at least absent sufficient governmental justification for infringing on that right. See, e.g., Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781, 796-97, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); Pacific Gas & Electric Co. v. Public Utilities Commission of California, 475 U.S. 1, 16, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion); Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 256-58, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). That foundational principle packs at least as much punch when you have room on your platform to carry a lot of speakers as it does when you have room on your platform to carry only a few speakers.
In short, the Supreme Court’s Turner Broadcasting decisions mean that Internet service providers possess a First Amendment right to exercise their editorial discretion over what content to carry and how to carry it. To be sure, the Turner Broadcasting decisions have sparked great controversy because they have constrained the Government’s ability to regulate the communications marketplace. See, e.g., Susan Crawford, First Amendment Common Sense, 127 Harv. L. Rev. 2343, 2345 (2014); Stuart Minor Benjamin, Transmitting, Editing, and Communicating: Determining What “The Freedom of Speech” Encompasses, 60 Duke L.J. 1673, 1682 (2011); Moran Yemini, Mandated Network Neutrality and the First Amendment: Lessons from Turner and a New Approach,. 13 Va. J.L. & Tech. 1, 38 (2008). Those critics advance very forceful arguments. Perhaps the Supreme Court will someday overrule or narrow those cases. But unless and until that happens, lower courts must follow the Supreme Court. The Turner Broadcasting cases were landmark decisions that were intended to (and have) marked the First Amendment boundaries for communications gatekeepers in the 21st century. And *431 under those decisions, the First Amendment does not allow the FCC to treat Internet service providers as mere pipeline operators rather than as First Amendment-protected editors and speakers.[9]
B
In light of the Turner Broadcasting decisions, Internet service providers have First Amendment rights. Of course, under the Supreme Court’s case law, First Amendment rights are not always absolute: The Government may sometimes infringe on First Amendment rights if the Government shows a sufficient justification for doing so.
Turner Broadcasting establishes that, to impose content-neutral regulations on Internet service providers, the Government must satisfy the intermediate scrutiny test. To satisfy the intermediate scrutiny test, the Government’s regulation must promote a “substantial governmental interest,” be “unrelated to the suppression of free expression,” and impose a restriction on First Amendment rights that “is no greater than is essential to the furtherance of that interest.” Turner Broadcasting, 512 U.S. at 662, 114 S.Ct. 2445 (internal quotation mark omitted) (quoting United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).
Does the FCC’s net neutrality rule satisfy intermediate scrutiny? The answer is no.
In the abstract, the intermediate scrutiny test is somewhat question-begging (as is the strict scrutiny test, for that matter). The test almost necessarily calls for common-law-like decisions articulating and recognizing exceptions and qualifications to constitutional rights. In this particular context, however, the Supreme Court has already applied the intermediate scrutiny test in a way that provides relatively clear guidance for lower courts.
Applying intermediate scrutiny, the Turner Broadcasting Court held that content-neutral restrictions on a communications service provider’s speech and editorial rights may be justified if the service provider possesses “bottleneck monopoly power” in the relevant geographic market. Id. at 661, 114 S.Ct. 2445; see also id. at 666-67, 114 S.Ct. 2445; Turner Broadcasting II, 520 U.S. 180, 117 S.Ct. 1174 (controlling opinion of Kennedy, J.).[10] But absent a demonstration of a company’s market power in the relevant geographic market, the Government may not interfere with a cable operator’s or an Internet service provider’s First Amendment right to exercise editorial discretion over the content it carries. See Comcast Cable Communications, LLC v. FCC, 717 F.3d 982, 993 (D.C. Cir. 2013) (Kavanaugh, J., concurring); Cablevision *432 Systems Corp. v. FCC, 597 F.3d 1306, 1323 (D.C. Cir. 2010) (Kavanaugh, J., dissenting).
At the time of the Turner Broadcasting decisions, cable operators exercised monopoly power in the local cable television markets. That monopoly power afforded cable operators the ability to unfairly disadvantage certain broadcast stations and networks. In the absence of a competitive market, a broadcast station had few places to turn when a cable operator declined to carry it. Without Government intervention, cable operators could have disfavored certain broadcasters and indeed forced some broadcasters out of the market altogether. That would diminish the content available to consumers. The Supreme Court concluded that the cable operators’ market-distorting monopoly power justified Government intervention. Because of the cable operators’ monopoly power, the Court ultimately upheld the must-carry statute. See Turner Broadcasting II, 520 U.S. at 196-208, 117 S.Ct. 1174 (controlling opinion of Kennedy, J.).
The problem for the FCC in this case is that here, unlike in Turner Broadcasting, the FCC has not shown that Internet service providers possess market power in a relevant geographic market. Indeed, the FCC freely acknowledges that it has not even tried to demonstrate market power. The FCC’s Order states that “these rules do not address, and are not designed to deal with, the acquisition or maintenance of market power or its abuse, real or potential.” Protecting and Promoting the Open Internet, 30 FCC Rcd. 5601, 5606 ¶ 11 n.12 (2015).[11]
Rather than addressing any problem of market power, the net neutrality rule instead compels private Internet service providers to supply an open platform for all would-be Internet speakers, and thereby diversify and increase the number of voices available on the Internet. The rule forcibly reduces the relative voices of some Internet service and content providers and enhances the relative voices of other Internet content providers.
But except in rare circumstances, the First Amendment does not allow the Government to regulate the content choices of private editors just so that the Government may enhance certain voices and alter the content available to the citizenry. As the Supreme Court stated in Buckley v. Valeo, in one of the most important sentences in First Amendment history: The “concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.” 424 U.S. 1, 48-49, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Court in Turner Broadcasting re-affirmed that Buckley principle, as have many other Supreme Court cases before and since. See, e.g., Arizona Free Enterprise Club’s Freedom Club PAC v. Bennett, 564 U.S. 721, 741, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011); Citizens United v. FEC, 558 U.S. 310, 350, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010); Meyer v. Grant, 486 U.S. 414, 426 n.7, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988); First National Bank of Boston v. Bellotti, 435 U.S. 765, 790-92, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).
Consistent with that bedrock Buckley principle, Turner Broadcasting did not *433 allow' the Government to satisfy intermediate scrutiny merely by asserting an interest in diversifying or increasing the number of speakers available on cable systems. After all, if that interest sufficed to uphold must-carry regulation without a showing of market power, the Turner Broadcasting litigation would have unfolded much differently. The Supreme Court would have had little or no need to determine whether the cable operators had market power. But the Supreme Court emphasized and relied on the Government’s market power showing when the Court upheld the must-carry requirements. See Turner Broadcasting II, 520 U.S. at 196-208, 117 S.Ct. 1174 (controlling opinion of Kennedy, J.). Indeed, in Turner Broadcasting II, Justice Breyer specifically disagreed with the Court’s emphasis on market power as the justification for the must-carry law. Justice Breyer would have held that the Government’s interest in promoting a multiplicity of voices sufficed to satisfy intermediate scrutiny. See id. at 226, 117 S.Ct. 1174 (Breyer, J., concurring in part). But the Court did not go that route.
To be sure, the interests in diversifying and increasing content are important governmental interests in the abstract, according to the Supreme Court. See Turner Broadcasting, 512 U.S. at 663, 114 S.Ct. 2445. But absent some market dysfunction, Government regulation of the content carriage decisions of communications service providers is not essential to furthering those interests, as is required to satisfy intermediate scrutiny. See id. at 662, 114 S.Ct. 2445 (Content-neutral regulation will be sustained “if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.”) (emphasis added) (internal quotation marks omitted). If the relevant communications marketplace is a competitive market, the theory is that the marketplace itself will both generate and provide room for a diversity and multiplicity of voices, without a need or justification for Government interference with private editorial choices. That is the lesson of the critical sentence in Buckley, it is the lesson of Turner Broadcasting-, and indeed, it is the lesson of the entire history of First Amendment and competition law.
Consider the implications if the law were otherwise. If market power need not be shown, the Government could regulate the editorial decisions of Facebook and Google, of MSNBC and Fox, of NYTimes.com and WSJ.com, of YouTube and Twitter. Can the Government really force Facebook and Google and all of those other entities to operate as common carriers? Can the Government really impose forced-carriage or equal-access obligations on YouTube and Twitter? If the Government’s theory in this case were accepted, then the answers would be yes. After all, if the Government could force Internet service providers to carry unwanted content even absent a showing of market power, then it could do the same to all those other entities as well. There is no principled distinction between this case and those hypothetical cases.
In short, under Turner Broadcasting, the net neutrality rule flunks intermediate scrutiny because the FCC has not shown that Internet service providers possess market power in a relevant geographic market.[12] It is debatable, moreover, wheth *434 er the FCC could make such a market power showing in the current competitive marketplace. One leading scholar has explained that the presence of “vibrant competition” in the Internet service market makes it “difficult to see how any court could invoke the bottleneck rationale articulated in Turner I to justify greater intrusions into Internet providers’ editorial discretion than would be permissible with respect to newspapers.” Christopher S. Yoo, Free Speech and the Myth of the Internet as an Unintermediated Experience, 78 Geo. Wash. L. Rev. 697, 748, 749 (2010). In any event, the FCC did not try to make such a market power showing here.[13]
The net neutrality rule reflects a fear that the real threat to free speech today comes from private entities such as Internet service providers, not from the Government. For that reason, some say, the Government must be able to freely intervene in the market to counteract the influence of Internet service providers.
That argument necessitates two responses. To begin with, the First Amendment is a restraint on the Government and protects private editors and speakers from Government regulation. The First Amendment protects the independent media and independent communications marketplace against Government control and overreaching.[14]
More to the point, the Turner Broadcasting cases already grant the Government ample authority to counteract the exercise of market power by private Internet service providers. If the Internet service providers have market power, then *435 the Government may impose open-access or similar carriage obligations. In other words, if private Internet service providers possess market power, then Turner Broadcasting already gives the Government tools to confront that problem.
Therefore, it is important to be crystal clear about one key point: The Supreme Court’s First Amendment precedents allow the Government to impose net neutrality obligations on Internet service providers that possess market power. In that respect, Turner Broadcasting reached a middle ground. The Supreme Court did not go as far as some wanted in terms of protecting cable operators’ editorial discretion even when the cable operators have market power. Some argued that a cable operator should receive the same First Amendment protections as a newspaper, whose editorial discretion is protected even if the newspaper has market power. See Tornillo, 418 U.S. 241, 94 S.Ct. 2831. But the Court in Turner Broadcasting did not adopt that absolutist principle for cable operators.
Therefore, absent a showing of market power, the Government must keep its hands off the editorial decisions of Internet service providers. Absent a showing of market power, the Government may not tell Internet service providers how to exercise their editorial discretion about what content to carry or favor any more than the Government can tell Amazon or Politics & Prose what books to promote; or tell The Washington Post or the Drudge Report what columns to carry; or tell ESPN or the NFL Network what games to show; or tell How Appealing or Bench Memos what articles to feature; or tell Twitter or YouTube what videos to post; or tell Face-book or Google what content to favor.
On this record, the net neutrality rule violates the First Amendment. For that reason alone, the rule is unlawful, even apart from the rule’s invalidity under the major rules doctrine discussed in Part I of this opinion.
[[Image here]]
In the hierarchical court system established by Article III, .a lower court must carefully follow Supreme Court precedent. If we faithfully apply current Supreme Court doctrine here, then this becomes a fairly straightforward case. First, Supreme Court precedent requires clear congressional authorization for an agency’s major rule. See Utility Air Regulatory Group v. EPA, 134 S.Ct. 2427, 2444 (2014). The net neutrality rule is a major rule. But Congress has not clearly authorized the FCC to issue the net neutrality rule. The rule is therefore unlawful. Second, Supreme Court precedent establishes that Internet service providers have a First Amendment right to exercise editorial discretion over whether and how- to carry Internet content. See Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The Government may interfere with that right only if it shows that an Internet service provider has market power in a relevant geographic market. But the FCC has not shown (or even attempted to show) market power here. On this record, therefore, the rule violates the First Amendment.
For those two alternative and independent reasons, the net neutrality rule is unlawful and must be vacated. I respectfully disagree with the panel’s contrary decision and, given the exceptional importance of the issue, respectfully dissent from the denial of rehearing en banc.

. I also agree with much of Judge Williams’ panel dissent and with much of Part III.A and Part III.B of Judge Brown's dissent from denial of rehearing en banc.
The concurrence in the denial of rehearing en banc suggests that the FCC may withdraw the net neutrality rule, mitigating any need for en banc review now. Unless and until the FCC does so, however, the panel opinion will remain the law of the Circuit. If the panel were to withdraw its opinion or if the opinion gets vacated as moot, then the need for en banc review would go away as well. But not until then, in my judgment.

. For completeness, two other cases warrant mention. First, in Massachusetts v. EPA, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), the Court concluded that the Clean Air Act’s provision for the regulation of new motor vehicles clearly authorized EPA to regulate the greenhouse gas emissions of those vehicles, once EPA made a finding that greenhouse gases may endanger the public health. See id. at 528-29, 127 S.Ct. 1438. So even though such a rule would presumably be a major rule, the statute clearly authorized it, according to the Court. In UARG, by contrast, the Court concluded that the Clean Air Act's Prevention of Significant Deterioration and Title V permitting programs did not clearly authorize EPA to regulate emitters of greenhouse gases under those programs.
Second, in King v. Burwell, - U.S. -, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015), the Court applied a form of the major rules doctrine and stated that Chevron deference did not apply to the major question of whether the Affordable Care Act authorized government subsidies to individuals who obtained health insurance on exchanges established by the Federal Government. Id. at 2488-89. That case is somewhat different from the prototypical major rules cases because the agency in that particular rule was not seeking to regulate or de-regulate (as opposed to tax or subsidize) some major private activity. Rather, the case concerned the scope of government subsidies under the health care statute. The case therefore seems to stand for the distinct proposition that Chevron deference may not apply when an agency interprets a major government benefits or appropriations provision of a statute.

. This Court has also employed the major rules doctrine. See, e.g., District of Columbia v. Department of Labor, 819 F.3d 444, 446 (D.C. Cir. 2016) (rejecting the Department of Labor’s interpretation of the Davis-Bacon Act, which regulates public works, to apply to construction of privately funded, owned, and operated buildings); Loving v. IRS, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (rejecting the Internal Revenue Service's interpretation of a tax statute to authorize new regulation of hundreds of thousands of tax-return preparers).

. Some commentators do not believe that there should be a major rules doctrine. See, e.g., Lisa Heinzerling, The Power Canons, 58 Wm. & Mary L. Rev. (forthcoming 2017); Kevin O. Leske, Major Questions About the “Major Questions” Doctrine, 5 Mich. J. Envtl. & Admin. L. 479 (2016). But as a lower court, we are constrained by precedent. The Supreme Court has articulated and applied the major rules doctrine in a series of high-profile and important cases. As a lower court, we cannot dismiss the Court’s repeated invocations of the doctrine as casual or meaningless asides. We cannot airbrush the cases out of the picture.

. One might wonder whether it was a major step for the FCC to impose even light-touch “information services” regulation on Internet service providers. The answer is no; indeed, *426 apparently no Internet service provider raised such a claim in Brand X. The FCC’s light-touch regulation did not entail common-carrier regulation and was not some major new regulatory step of vast economic and political significance. The rule at issue in Brand X therefore was an ordinary rule, not a major rule. As a result, the Chevron doctrine applied, not the major rules doctrine.

. The concurrence in the denial of rehearing en banc articulates what it describes as “two distinct species of ambiguity.” Concurrence at 386. The concurrence distinguishes (i) whether the statute itself clearly classifies Internet service providers as telecommunications providers and (ii) whether the statute clearly authorizes the agency to classify Internet service providers as telecommunications providers. I agree that those are two distinct questions. But the answer to both questions is no. I see no statutory language that, in the concurrence’s words, "clearly classifies ISPs as telecommunications providers” or "clearly authorizes the agency to classify ISPs as telecommunications providers.” Id. Nor did Brand X, as I read it, say either of those two things.

. If the major rules doctrine meant only that Chevron did not apply, but did not go so far as to require clear congressional authorization for a major rule, we would then simply determine the better reading of this statute without a thumb on the scale in either direction. It is not necessary to delve deeply into that hypothetical inquiry here, but the better reading of this statute is that Internet service is an information service, as Judge Brown has explained. See Brown Dissent at 395-96.

. The concurrence in the denial of rehearing en banc seems to suggest that the net neutrality rule is voluntary. According to the concurrence, Internet service providers may comply with the net neutrality rule if they want to comply, but can choose not to comply if they do not want to comply. To the concurring judges, net neutrality merely means "if you say it, do it.” Concurrence at 392. If that description were really true, the net neutrality rule would be a simple prohibition against false advertising. But that does not appear to be an accurate description of the rule. See Protecting and Promoting the Open Internet, 30 FCC Rcd. 5601, 5682 ¶ 187 (2015) (imposing various net neutrality requirements on an Internet. service provider that "provides the capability” to access "all or substantially all” content on the Internet) (italics omitted). It would be strange indeed if all of the controversy were over a "rule” that is in fact entirely voluntary and merely proscribes false advertising. In any event, I tend to doubt that Internet service providers can now simply say that they will choose not to comply with any aspects of the net neutrality rule and be done with it. But if that is what the concurrence means to say, that would of course avoid any First Amendment problem: To state the obvi *430 ous, a supposed "rule” that actually imposes no mandates or prohibitions and need not be followed would not raise a First Amendment issue.

. The concurrence in the denial of rehearing en banc notes that the cable trade association NCTA has not raised a First Amendment argument. But other Internet service providers have raised the First Amendment argument in this and other forums. And NCTA itself has previously argued that net neutrality obligations violate the First Amendment. See, e.g., National Cable & Telecommunications Association, Comment Letter on Preserving the Open Internet 49-64 (Jan. 14, 2010). Moreover, the concurrence's point reflects a misunderstanding of who NCTA now is. NCTA represents content providers as well as cable operators. And content providers obviously have little interest in advocating for the First Amendment rights of Internet service providers and video programming distributors. That presumably explains NCTA’s current silence on the First Amendment issue.

. In Turner Broadcasting II, Justice Kennedy’s opinion for four justices was controlling because it represented the "position taken by those Members who concurred in the judgment ] on the narrowest grounds.” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

. Because the FCC has not tried to show market power, I need not determine exactly what a market power showing would entail in this context with respect to market share and the like. In Turner Broadcasting, the Court relied on the fact that the cable operators possessed "bottleneck monopoly power.” 512 U.S. at 661, 114 S.Ct. 2445; see also id. at 666-67, 114 S.Ct. 2445.

. At a minimum, Turner Broadcasting requires the Government to show market power in order to satisfy intermediate scrutiny. But Tumer Broadcasting seems to require even more from the Government. The Government apparently must also show that the market *434 power would actually be used to disadvantage certain content providers, thereby diminishing the diversity and amount of content available. See Turner Broadcasting, 512 U.S. at 664-68, 114 S.Ct. 2445; Turner Broadcasting II, 520 U.S. at 196-213, 117 S.Ct. 1174 (controlling opinion of Kennedy, J.).

. Some defenders of net neutrality raise a slippery slope argument: If the First Amendment really bars the net neutrality rule, then the First Amendment would also bar Government regulation of telephone companies that connect person-to-person calls. That scary-sounding hypothetical is unpersuasive, however, because the telephone company is not engaged in carrying or making mass communications in those circumstances: "Mass-media speech implicates a broader range of free speech values that include interests of audiences and intermediaries, as well as speakers.” Yoo, Free Speech, 78 Geo. Wash. L. Rev. at 701. The transmission of person-to-person communications does not implicate the same editorial discretion issues. So that slippery slope argument is not a persuasive reason to fear, or refrain from recognizing, Internet service providers’ First Amendment rights.

. Over the years, many highly respected academic commentators have questioned that vision of the First Amendment. They have advanced extremely thoughtful arguments. See, e.g., Cass R. Sunstein, Democracy and the Problem of Free Speech (1993); Robert Post & Amanda Shanor, Adam Smith's First Amendment, 128 Harv. L. Rev. F. 165 (2015). But the traditional laissez-faire model still reflects the basic tenor of the Supreme Court’s First Amendment jurisprudence. Indeed, that approach to the First Amendment seems to have grown only stronger in recent decades. See, e.g., Brown, 564 U.S. 786, 131 S.Ct. 2729, 180 L.Ed.2d 708; Sorrell v. IMS Health Inc., 564 U.S. 552, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011); United States v. Stevens, 559 U.S. 460, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010); Citizens United, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753; Thompson v. Western States Medical Center, 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002); Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001); Greater New Orleans Broadcasting Association, Inc. v. United States, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999); 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); Rubin v. Coors Brewing Co., 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). As a lower court, we of course must take the Supreme Court’s jurisprudence as we find it.